Arthur Henry BERGHAHN, Appellant,

v.

The STATE of Texas, State.

No. 2–82–235–CR.

Court of Appeals of Texas, Fort Worth.

Oct. 10, 1985.

Charles E. Perry, Wichita Falls, Newman, Martin & Dodd, Bruce A. Martin, Iowa Park, for appellant.

Barry L. Macha, Asst. Dist. Atty., Wichita Falls, Haynes & Fullenweider, Jack B. Zimmermann, Houston, amicus curiae on behalf of Texas Criminal Defense Lawyers Assn.

Before ASHWORTH and JOE SPURLOCK, II and HILL, JJ.

## OPINION

JOE SPURLOCK, II, Justice.

This is this court's second consideration of appellant's, Arthur Henry Berghahn's, appeal from his conviction for murder. TEX.PENAL CODE ANN. sec. 19.02(a)(3) (Vernon 1974). The jury found appellant guilty of the offense of murder and assessed his punishment at 99 years confinement in the Texas Department of Corrections. Upon the first consideration of Berghahn's appeal, this court found fundamental error in the jury charge and reversed his conviction because the jury charge had failed to include a blank for the jury to record a verdict of not guilty if they had desired to do so. See Berghahn v. State, 660 S.W.2d 877 (Tex.App.—Fort Worth 1983, pet. granted) (Justice Spurlock II, dissenting). That case was reversed by the Court of Criminal Appeals which found that the omission of such a blank in the verdict form was not reversible error, absent objection, and the case was remanded for consideration of the other grounds of error. See Berghahn v. State, 683 S.W.2d 697 (Tex.Crim.App.1984), cert. denied, —— U.S. ——, 105 S.Ct. 2120, 85 L.Ed.2d 484 (1985).

Berghahn has raised seven grounds of error on appeal. This court's original opinion reversing Berghahn's conviction was based upon ground of error number five. The opinion of the Court of Criminal Appeals has disposed of that ground of error. In his other grounds of error Berghahn asserts the trial court erred in denying a change of venue, in admitting his written statement, and in overruling his motion for instructed verdict of acquittal based upon the State's failure to show that the Grand Jury used due diligence in attempting to

ascertain the instrumentality which caused the victim's death.

Because we find no error in the trial of the case below, we affirm the judgment.

Berghahn does not challenge the sufficiency of the evidence. Basically, the testimony revealed that the decedent, seven-year-old Gregory Alan Poore, lived with his mother, Jill Berghahn, and his stepfather, the appellant, Arthur Henry Berghahn. Gregory disappeared in Wichita Falls, Texas on his way home from school on November 18, 1981, and the police were called by the parents. After a seventeen-hour search, the boy's body was found by one of the several hundred volunteers who were searching the countryside near the boy's trailer park home. The Medical Examiner's Autopsy Report stated that:

CONCLUSION:

It is our opinion that Gregory Allen Poore, a seven-year-old white male child, died as a result of an incised wound of the neck (cut throat), measuring $4\frac{1}{2} \times 1\frac{1}{4} \times \frac{1}{2}$ inch. Autopsy revealed complete severing of the left carotid artery (one of the main arteries of the body) and the trachea (windpipe), resulting in blood loss and the inability to breathe. There were also scattered abrasions and ecchymoses (bumps and bruises) of the body.

MANNER OF DEATH: HOMICIDE

Approximately three weeks later, appellant, Arthur Berghahn, gave a "Voluntary Statement" to the Wichita Falls Police Department, in which he acknowledged that as a result of certain of his actions, his stepson, Gregory Poore, had died. Specifically, in this nineteen-page document, which was presented in a narrative question and answer format, Berghahn stated that on the day of his stepson's death, his wife had called him at work and was rather upset that Gregory was not yet home from school, whereupon Berghahn left work and went home. The police were then called, and Berghahn drove his vehicle down to a field that Gregory crossed daily when traveling to and from school. Berghahn found Gregory playing in the high grass and asked him why he was not at home. Gregory responded by saying he was out playing, and Berghahn stated that he gave Gregory a swat across the side of the face, grabbed him by the collar and started walking down the road. Gregory pulled away and began running, and Berghahn ran after him.

In his statement, Berghahn stated that he found a long narrow strip of sheet metal, 2 to 2½ feet long by 3 inches wide, and picked it up, intending to smack Gregory across the back. However, at that point Gregory abruptly turned around and the sheet metal hit him in the neck. Apparently Berghahn knew at that point that his stepson was dead, but he left his body in the field and returned home. Berghahn did not tell anyone, including his wife, about his involvement until his statement was given three weeks after the death occurred. Berghahn did not testify at any stage of his trial.

In ground of error number one Berghahn complains that the trial court committed error in denying his motion to quash the indictment. He argues that he should have been indicted under the specific statute (injury to a child), and not under the murder statute, specifically felony murder. *Compare* TEX.PENAL CODE ANN. sec. 22.04(a)(4) (Vernon Supp.1985), with sec. 19.02(a)(3) (Vernon 1974). The indictment charged Berghahn with committing murder under all three methods listed in section 19.02. The third paragraph of the indictment (alleging felony murder) charged that the underlying felony was "injury to a child by then and there intentionally and knowingly engaging in conduct that caused bodily injury" to the victim. The jury was charged on murder under the third paragraph of the indictment, and also on voluntary manslaughter, involuntary manslaughter, criminally negligent homicide, reckless injury to a child and criminally negligent injury to a child. The jury found Berghahn guilty of murder. The jury was *not* charged upon the first two paragraphs of the indictment alleging murder by intentionally and knowingly causing the death

of an individual, or murder by intending to cause serious bodily injury to an individual by committing an act clearly dangerous to human life, thereby causing the death of the individual.

The crux of Berghahn's argument is simply that the evidence in the case was insufficient for him to have been convicted of the offense of murder by intentionally and knowingly causing the death of an individual or of murder by intending to cause serious bodily injury to an individual and thereafter committing an act dangerous to human life, because there was no evidence of *any culpable mental state* sufficient to sustain the burden of proof under either of these two parts of the murder statute. After the evidence was presented, the State elected to waive these counts. However, by proceeding under part 3 of the murder statute, the State was able to obtain a conviction for murder by substituting for the intentional and knowing provision of part 1 of the murder statute and by substituting for the intent to cause serious bodily injury under part 2 of the murder statute, only the underlying intent to cause "bodily injury" to a child, a felonious assault, raising the level of the offense to felony murder. Berghahn was charged with having committed the offense of felony murder by engaging only in the offense of injury to a child, by intentionally and knowingly engaging in conduct that caused bodily injury to the child. Further, while engaged in that conduct, the indictment charged he committed an act clearly dangerous to human life that caused injury to the child resulting in the death of the child.

His argument, in essence, is that the second part of the charging paragraph, that is, doing an act clearly dangerous to human life, did not allege a culpable mental state as required by TEX.PENAL CODE ANN. sec. 6.02(a), (b) (Vernon 1974). He argues that both the underlying felony of injury to the child charged in first part of the paragraph, and the act clearly dangerous to the child which caused the death of the child charged in the second part, were one and the same transaction. As one inseparable legal transaction, Berghahn argues the State is precluded from using the "intent" in the felony of injury to a child to "boot strap" that assault to the proposition he "intentionally" committed an act clearly dangerous to human life resulting in death, in order to invoke the felony murder rule.

The particular portion of the charge, which is basically the same as the indictment, reads as follows:

> [I]f you believe from the evidence beyond a reasonable doubt, that the defendant, Arthur Henry Berghahn, on or about the 18th day of November, 1981, ... did then and there attempt to commit and did commit the felony offense of Injury to a Child by then and there intentionally and knowingly engaging in conduct that caused bodily injury to Gregory Alan Poore, a child younger than 15 years of age, and while in the course of and furtherance of the attempt and commission of said offense, did then and there commit an act clearly dangerous to human life, to-wit: did then and there cut the throat of the said Gregory Alan Poore with an instrument unknown to the Grand Jury, thereby causing the death of the said Gregory Alan Poore, you will find the defendant guilty of the offense of Murder....

The law of the State of Texas in this area is not well settled. In an opinion on a matter closely related to the one in this case, the Court of Criminal Appeals has held that the felony murder rule dispenses with any inquiry into the mens rea accompanying the homicide itself, and the underlying felony supplies the necessary culpable mental state. *Garrett v. State*, 573 S.W.2d 543 (Tex.Crim.App.1978). This is the established law of this State and was first recognized in principle in *Rodriguez v. State*, 548 S.W.2d 26 (Tex.Crim.App.1977). However, the Court of Criminal Appeals in *Garrett*, having stated the general rule applying to TEX.PENAL CODE ANN. sec. 19.02(a)(3) (Vernon 1974) (felony murder rule), observed in particular the following:

> The instant prosecution must rest on the proposition that the intent with which

the act of aggravated assault was committed can be transferred to the act which caused the homicide. The indictment charges that the gravamen of the aggravated assault was threatening decedent with a gun and that the dangerous act resulting in death was pulling a loaded pistol from his pocket to scare the decedent. The State is thus attempting to use the very act which caused the homicide, committing an aggravated assault by use of a deadly weapon, as the felony which boosts the homicide itself into the murder category.

*To allow this would make murder out of every aggravated assault that results in a death.* It would relieve the State of the burden of proving an intentionally or knowingly caused death in most murder cases because murder is usually the result of some form of assault. [Emphasis supplied.]

*Garrett*, 573 S.W.2d at 545.

The court then discussed how this rule has been applied in other jurisdictions and concluded with the following statement concerning the law in Texas:

The felony murder rule calls for the transfer of intent from one criminal act to another, from the underlying felony to the act causing the homicide. [Citations omitted.] In the present case appellant pulled a gun which went off, [the bullet] striking the victim. The aggravated assault and the act resulting in the homicide were one and the same. The application of the felony murder doctrine to situations such as this is an attempt to split into unrelated parts an indivisible transaction. *There must be a showing of felonious criminal conduct other than the assault causing the homicide.*

*Any other result in this case would allow circumvention of the statutory limits of the felony murder statute....* If a felony murder may be predicated on the underlying aggravated assault, the statutory restriction on the scope of the doctrine that prohibits basing a felony murder prosecution on voluntary manslaughter could be regularly circumvented. ... To hold to the contrary would render the statute meaningless and its effect nill. [Emphasis supplied.]

*Id.* at 545–46.

The Court of Criminal Appeals reversed the conviction in *Garrett v. State.* This would appear to be dispositive of the issue in this case, for the felony offense of injury to a child is within the assaultive offenses of the Penal Code. It is in fact a continuation of the former Penal Code provision of aggravated assault on a child. The rationale applied by Judge Odom in the *Garrett* case would appear to apply equally to the underlying assaultive event of injury to a child in the current case. We can see no distinction between the two cases, *Garrett* or this one.

However, *Garrett* is not the definitive word on this issue in the State of Texas. Since *Garrett* was decided in 1978, a case reaching a different conclusion was decided in 1981. In this case, *Ex parte Easter*, 615 S.W.2d 719 (Tex.Crim.App.1981), *cert. denied*, 454 U.S. 943, 102 S.Ct. 481, 70 L.Ed.2d 252 (1981), the court sitting en banc in an opinion by Justice Quentin Keith, Commissioner, specifically refused to apply the reasoning, logic and result in the *Garrett* opinion to the case before them.

In *Easter*, the conviction had been obtained using the felony offense of injury to a child as the underlying offense for felony murder. As reported in the *Easter* opinion, the indictment there was virtually the same as the indictment in this case on appeal. *Easter* was a post-conviction habeas corpus proceeding wherein Justice Keith noted that Easter was convicted under the provisions of TEX.PENAL CODE ANN. sec. 19.02(a)(3), the felony murder statute, for causing the death of his ten-month-old daughter by committing and attempting to commit acts clearly dangerous to her life which did cause her death, to wit: by striking her with his hands and fists, choking and throwing and dropping her on the floor and using other instruments unknown to the grand jury.

The particular issue in *Easter* was petitioner's complaint that the indictment was fundamentally defective and therefore could be challenged for the first time in a post-conviction habeas corpus proceeding. The court held the indictment was not fundamentally defective, but more importantly for the considerations of this case on appeal, the court noted the following:

Petitioner sets out his contentions in concise form in his memorandum supporting his application for the writ, saying:

"First, the state proceeded against petitioner only on the [third] count of the indictment invoking the felony murder doctrine, V.T.C.A., Penal Code sec. 19.02(a)(3). Second, the acts charged in the indictment as constituting the predicate felony, 'injury to a child' (V.T.C.A. Penal Code sec. 22.04) were the same acts that the state alleged caused the death of petitioner's daughter. Finally, the court instructed the jury that the felony offense of 'injury to a child' may be committed with criminal negligence and that that offense would support a conviction of murder under the definition of felony murder in Penal Code sec. 19.02(a)(3)."

*Easter*, 615 S.W.2d at 720. After setting out the contention before the court in *Easter*, the court continued its analysis:

Primary reliance is placed upon *Garrett v. State*, 573 S.W.2d 543 (Tex.Cr.App. 1978), wherein it was held that the intent with which the act of aggravated assault was committed could not be transferred to the act which caused the homicide. In so holding, we held that there must be "a showing of felonious criminal conduct other than the assault causing the homicide." (573 S.W.2d at 546) He also relies upon language found in *Rodriguez v. State*, 548 S.W.2d 26, 28 (Tex.Cr.App. 1977), wherein we held that a conviction of murder may not be sustained on the basis of criminally negligent conduct alone.

*Id.* It seems at this point that the rationale of *Garrett* should have been followed;

however, having set out the question before the court, the court continued as follows:

Petitioner's reliance upon the cited cases is misplaced. It is well settled that one who, intending to commit a felony, accidentally commits another felony, is guilty of the felony actually committed. *Honea v. State*, 585 S.W.2d 681, 685 (Tex.Cr.App.1979). We are here concerned with the felony murder rule and the theory of transferred intent. See and cf. *Kuykendall v. State*, 609 S.W.2d 791, 794–795 (Tex.Cr.App.1980).

The felony murder rule as now embodied in the present Penal Code dispenses with inquiry into the mens rea accompanying the homicide itself. The underlying felony—here the injury to a child—supplies the necessary culpable mental state. The indictment was not fundamentally defective so as to be susceptible to challenge for the first time in a post-conviction writ of habeas corpus. *Ex parte Bailey*, 600 S.W.2d 331, 332 (Tex. Cr.App.1980). See also, *Garrett v. State*, supra (573 S.W.2d at 545); *Rodriguez v. State*, supra (548 S.W.2d at 28).

*Id.* at 720–21. The court's conclusion was: "We reject petitioner's attempt to equate the underlying felony in this case—injury to a child—with that confronting the Court in *Garrett v. State*, supra." *Id.* at 721.

The result reached en banc in *Easter* is disturbing because it appears to be directly in contrast to the reasoning and logic that was applied in *Garrett*. We have concluded, however, that the court carefully considered the rationale in the *Garrett* case when it decided en banc to issue the opinion in the *Easter* case, and therefore we believe that the result in *Easter* should prevail, although the court neither overruled *Garrett* nor distinguished *Easter* from *Garrett*.

There has been another case decided by the Court of Criminal Appeals in which felony murder was charged in the indictment with the underlying felony being injury to a child. In that case the Court of Criminal Appeals implicitly approved of

this type of felony murder conviction. *See Ex parte Bailey*, 600 S.W.2d 331 (Tex. Crim.App.1980).

In *Bailey*, like *Easter*, the issue on appeal was an attempt to raise, by an application for writ of habeas corpus, a complaint that the indictment was fundamentally defective. The allegation in *Bailey* was that the indictment failed to allege a culpable mental state. The Court of Criminal Appeals disagreed. Judge Douglas noted:

> The indictment sets forth all the elements of the statute. We have held, since *Standley v. State*, 517 S.W.2d 538 (Tex.Cr.App.1975), that only those indictments which fail to set forth an offense will be considered fundamentally defective and susceptible to challenge the first time in a post-conviction writ of habeas corpus. [Citations omitted.]

*Id.* at 332. No discussion was made of the rationale or opinion in *Garrett*. The particular point on appeal was that the word "attempt" was used in two different parts of the indictment and according to Judge Clinton's dissenting opinion, this had the effect of allowing the word "attempt" to perform double duty as the requisite "intent" to commit the crime. Nevertheless, the case was affirmed, and no discussion made of the contrary result in *Garrett*.

It is clear to anyone reviewing the cases on this issue that there is a troublesome question in trying to determine exactly the extent to which the Legislature meant to permit an underlying felony to provide the culpable mental state necessary to raise certain types of criminal activity to the level of murder, when a person's death resulted from that activity. We hold that the question of whether or not to permit the felony offense of injury to a child to be used as the underlying offense in felony murder has been settled by the holding in *Easter v. State*, notwithstanding other opinions to the contrary (note especially *Aguirre v. State*, 693 S.W.2d 942 (Tex. Crim.App., 1982) (panel opinion, Judge Davis dissenting, motion for reh'g granted) (not yet reported)). Further, we take refuge in the logic and reasoning of the Court of Criminal Appeals in its holding in *Rodriguez v. State*, 548 S.W.2d at 29, by paraphrasing a comment made therein. Suffice it to state, without a lengthly academic discussion of the differing opinions of the Court of Criminal Appeals, "that the Legislature has seen fit to exempt only the felonies of voluntary and involuntary manslaughter (from felony murder rule application), and we will not add to that statutory exemption." The first ground of error is overruled.

Berghahn's second and third grounds of error challenge the trial court's denial of his motion to change venue because of inflammatory pre-trial publicity. Ground of error number two asserts that the State's controverting affidavits were insufficient, and therefore venue should have been changed as a matter of law. In ground of error number three, Berghahn contends the trial court abused its discretion in not changing venue.

TEX.CODE CRIM.PROC.ANN. art. 31.-03(a) (Vernon Pamp. 1966 to 1985) provides, in pertinent part, as follows:

> (a) A change of venue may be granted in any felony or misdemeanor case punishable by confinement on the written motion of the defendant, supported by his own affidavit and the affidavit of at least two credible persons, residents of the county where the prosecution is instituted, for either of the following causes, the truth and sufficiency of which the court shall determine:
>
> > (1) That there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial; ...

*Id.* The credibility of the persons making affidavit for change of venue, or their means of knowledge, may be attacked by the affidavit of a credible person. TEX. CODE CRIM.PROC.ANN. art. 31.04 (Vernon 1966).

Attached to Berghahn's motion for change of venue (in addition to Berghahn's own affidavit) were the affidavits of two residents of Wichita County. These affi-

**950**

ants both stated their opinions that based upon inflammatory newspaper articles and radio and television broadcasts concerning Berghahn, he could not obtain a fair and impartial trial in Wichita County, Texas. The State filed three controverting affidavits, all of them identical in form and substance, the pertinent parts of which are as follows:

THE STATE OF TEXAS
COUNTY OF WICHITA

BEFORE ME, the undersigned authority, on this day personally appeared [*Affiant's name*], who after being duly sworn stated:

"My name is [*Affiant's name*], I am over eighteen years of age and I am a resident of Wichita County, Texas. I have read the affidavits in support of Defendant's Motion for Change of Venue in this cause. *The means of knowledge of the affiants of said affidavits are not sufficient to support and justify the statements contained therein.*" [Emphasis supplied.]

/S/ _____
Affiant

Berghahn submits that the controverting affidavits are conclusory and insufficient because they do not include any *facts* which challenge the credibility or the means of knowledge of Berghahn's affiants. Therefore, Berghahn claims, the State's affidavits should not have been considered by the trial court and Berghahn was entitled to a change of venue as a matter of law.

█ Usually, where the accused's properly supported motion for change of venue is not properly controverted by the State, the accused is entitled to have venue changed as a matter of law. *Revia v. State*, 649 S.W.2d 625, 627 (Tex.Crim.App. 1983); *Durrough v. State*, 562 S.W.2d 488, 489 (Tex.Crim.App.1978, en banc). Berghahn offers no case authority for his proposition that the controverting affidavits must contain a factual basis for their statements, and we have found none directly on point. The ultimate question to be answered, in the context of Berghahn's mo-

tion, is whether public sentiment existed to deprive Berghahn of a fair trial. A controverting affidavit is not intended as a complete paper answer to a defendant's challenge; it is not designed to enable the trial judge to resolve the ultimate issue upon motions and affidavits. *Turner v. State*, 641 S.W.2d 383, 385 (Tex.App.—El Paso 1982, pet. ref'd). Rather, it merely acts so as to prevent a decision on the basis of paper offerings and it requires a hearing with live testimony and evidence. *Id.*

In *Turner,* the Court of Appeals held that although the content of the State's affidavits would have been appropriate for presentation via live testimony at a hearing on appellant's motion to change venue, the State's affidavits did not meet the requirements for shifting the issue into such a setting, where they failed to attack in any manner the credibility of appellant's affiants or their means of knowledge with regard to community sentiment. This was true notwithstanding the fact that the affidavits did express the affiants' views that community sentiment was such that the defendant could not receive a fair trial, and they provided a basis for their position.

█ We find that the State's controverting affidavits in the case at bar adequately complied with the requisites of art. 31.04 and were sufficient to raise a fact question with regard to whether adverse publicity existed, and whether Berghahn could receive a fair trial in Wichita County, Texas. *See McManus v. State*, 591 S.W.2d 505, 516 (Tex.Crim.App.1979, en banc). Accordingly, we hold that the trial court did not err in overruling Berghahn's motion to change venue as a matter of law. Ground of error number two is overruled.

Berghahn's third ground of error is considerably more complex. At the hearing on his motion to change venue, Berghahn presented six witnesses; the State did not present any witnesses, although Berghahn cross-examined Ardath Walch, one of the State's affiants. After both sides had closed, the trial court made the following ruling:

THE COURT: All right. The Court will point out that under Article 31.03 of the Texas Code of Criminal Procedure a Change of Venue may be granted and so forth if there is proof that there exists in the county where the prosecution is commenced a greater prejudice against the Defendant and he cannot obtain a fair and impartial trial. After hearing the testimony today, the Court is not of the opinion that that has been proven. I will concede that the Defense Attorneys have done a good job that there was extensive news coverage of this case and that there was alot of news about the time of the seven-year-old boy, the Greg Poore boy, was missing, and there were a number of newscasts on that. *Also, there was a considerable news coverage at the time the Defendant was arrested and accused, but there has been no witness yet that said they were convinced he was guilty. In fact, all the evidence is to the contrary, that he is still innocent until proven guilty.* And the Court does not feel that just because there is a large volume of publicity on a case, under my interpretation of the Texas Code of Criminal Procedure, does not automatically guarantee the Defendant the right to change venue to another county. However, because of the questions raised, I will reserve final judgment until the day of the trial on Monday, November 15th, and hear the responses of the jurors to the questions of the attorneys on voir dire. And after that I will make a final determination on this issue. That's all on the point, Motion for Change of Venue. [Emphasis supplied.]

The record contains a transcript of the jury voir dire. Each of the forty-eight venirepersons was examined and three were excused at the outset because they stated they could not be fair and impartial due to their acquaintance with someone in the case. Out of the remainder, thirty-three venirepersons indicated that they had heard about the case either by reading the newspaper, listening to the radio, or watching television. Of this group of thirty-three, six venirepersons were excused by the trial court because they could not be fair and impartial. Additionally, one venireperson was excused for a reason which does not appear in the appellate record, and another was excused because, although she stated she had not formed an opinion as to Berghahn's guilt or innocence, she felt that she would be prejudiced inasmuch as she was a school nurse and was involved with so many students. The remainder of the thirty-three all stated that they had not formed an opinion or impression as to Berghahn's guilt or innocence, and they could decide the case solely on the basis of the evidence presented at trial. After a jury had been selected, the trial court overruled Berghahn's motion for change of venue.

We note initially that Berghahn has not presented any authority in support of his argument. An appellate brief which is conclusory only and cites to no authority presents nothing for review. *Brooks v. State,* 642 S.W.2d 791, 797 (Tex.Crim.App. 1982); *McWherter v. State,* 607 S.W.2d 531, 536 (Tex.Crim.App.1980). However, in the interest of justice we will proceed to address Berghahn's ground of error.

We are cognizant that the question of whether a change of venue should be granted because of prejudicial pre-trial publicity is one of constitutional dimension. *See Banks v. State,* 643 S.W.2d 129, 132 (Tex.Crim.App.1982, en banc), *cert. denied,* 464 U.S. 904, 104 S.Ct. 259, 78 L.Ed.2d 244 (1983). However, the applicant seeking a change of venue bears a heavy burden to prove the existence of such prejudice in the community such that the likelihood of obtaining a fair and impartial trial is doubtful. *Nethery v. State,* 692 S.W.2d 686, 694 (Tex.Crim.App.1985) Absent such a showing, the trial judge is within the limits of his discretion in denying the change of venue. *Id.; Ussery v. State,* 651 S.W.2d 767, 772 (Tex.Crim.App.1983). The test is whether outside influences affecting the community's climate of opinion as to a defendant are inherently suspect. *Netherly,* 692 S.W.2d at 694; *Banks,* 643 S.W.2d at 132. *See also Sheppard v. Maxwell,* 384

U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). This standard "does not require that jurors be totally ignorant of the facts and issues and '... scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.' " *Eckert v. State*, 623 S.W.2d 359, 363 (Tex.Crim.App. 1981).

At the hearing on Berghahn's motion to change venue, his first two witnesses were attorneys. Both testified that although the news coverage (newspaper articles, radio and television broadcasts) concerning the death of Gregory Poore were fair and accurate accounts of the incident, nevertheless, the publicity was inflammatory and appellant could not receive a fair and impartial trial in Wichita County. Through other witnesses Berghahn introduced numerous newspaper accounts of the incident from the Wichita Falls Times and Record Newspaper, and data concerning the number of the paper's subscribers and its viewing area. Additionally, scripts from the television broadcasts were introduced into evidence and read to the court. Appellant's last witness was one of the persons who signed a controverting affidavit in support of the State's opposition to Berghahn's motion to change venue.

■ We have considered all the evidence introduced at the pretrial hearing on Berghahn's motion to change venue, including the entire contents of the exhibits from the newspapers and the television scripts, and the voir dire examination of the prospective jurors. The newspaper and television accounts concerning the case appear to be accurate, informative and objective, and the information contained therein was so placed for the purpose of informing the public of current events. *See McManus*, 591 S.W.2d at 517–18; and *Demouchette v. State*, 591 S.W.2d 488, 490 (Tex.Crim.App. 1979, en banc), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981). Although a majority of the prospective jurors had heard or read of the case, the record includes testimony that the case would be strictly tried on the basis of the evidence before them, and that a verdict would be based upon what was heard and observed in the courtroom. *See Eckert*, 623 S.W.2d at 363. The trial court was presented with conflicting testimony with respect to whether Berghahn could obtain a fair trial in the local community because of pre-trial publicity, and we find no evidence to demonstrate an abuse of the trial court's discretion in denying Berghahn's motion to change venue. Berghahn's third ground of error is overruled.

In ground of error number four, Berghahn contends the trial court erred in admitting into evidence Berghahn's written statement inasmuch as the standard *Miranda* warnings,[1] which were given by the magistrate, are not shown on the face of the document, contrary to TEX.CODE CRIM.PROC.ANN. art. 38.22, sec. 2(a) (Vernon 1979). The State's response is that the written statement of appellant was not the result of custodial interrogation, and was therefore admissible under sec. 5 of art. 38.22, which provides that nothing in art. 38.22 precludes the admission of a statement that does not stem from custodial interrogation. In his brief, Berghahn has not cited any case authority in support of his position and does not address the State's theory of admissibility; rather, he simply states: "It cannot be seriously contended, under the facts presented, that Appellant was not under custodial interrogation at the time the statement was taken."

The trial court conducted a pre-trial hearing on Berghahn's motion to suppress his December 11, 1981 written statement. The court filed findings of fact and conclusions of law and concluded that the written statement was not the product of custodial interrogation, was made freely and voluntarily by Berghahn, and was admissible as evidence in accordance with the provisions of TEX.CODE CRIM.PROC.ANN. art. 38.-22, sec. 5 (Vernon 1979). That section provides as follows:

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct.    1602, 16 L.Ed.2d 694 (1966).

Sec. 5. *Nothing in this article precludes the admission* of a statement made by the accused in open court at his trial, before a grand jury, or at an examining trial in compliance with Articles 16.03 and 16.04 of this code, or of a statement that is the res gestae of the arrest or of the offense, or *of a statement that does not stem from custodial interrogation,* or of a voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness, or of any other statement that may be admissible under law. [Emphasis supplied.]

*Id.*

On appeal, challenges to the trial court's ruling regarding the voluntariness of a confession generally should be directed to whether the court abused its discretion in one of its findings of fact or whether the court properly applied the law to those facts found by it. *Sinegal v. State,* 582 S.W.2d 135, 137 (Tex.Crim.App.1979). In reviewing the trial court's findings, it must be remembered that at the hearing to determine the voluntariness of a confession, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See Bonham v. State,* 680 S.W.2d 815, 822 (Tex.Crim.App.1984); *Hawkins v. State,* 660 S.W.2d 65, 72 (Tex.Crim.App.1983). As such, the trial court may believe or disbelieve all or any part of any witness's testimony. *Hawkins,* 660 S.W.2d at 72; *English v. State,* 592 S.W.2d 949, 952 (Tex.Crim.App.1980), *cert. denied,* 449 U.S. 891, 101 S.Ct. 254, 66 L.Ed.2d 120 (1980).

The determinative issue thus presented is whether Berghahn was "in custody" at the time he signed the nineteen-page "Voluntary Statement". The investigating officer testified that he specifically used this particular form, as opposed to one which has the pre-printed *Miranda* warnings at the top of the page, inasmuch as Berghahn was not under arrest at the time he gave this statement. As the United States Supreme Court has stated, "Unfortunately,

the task of defining 'custody' is a slippery one", *see Oregon v. Elstad,* —— U.S. ——, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985), and, of course, "Voluntary statements 'remain a proper element in law enforcement.'" *Id.,* —— U.S. at ——, 105 S.Ct. at 1291. The most recent expression of the Texas Court of Criminal Appeals concerning the interpretation of custodial interrogation is *Turner v. State,* 685 S.W.2d 38 (Tex.Crim.App.1985). As stated by that court:

Custodial interrogation means "... questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Miranda,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612. A person need not be under "formal" arrest in order to be in custody. The facts of each case must be examined in light of the four factors delineated as the guides in which to evaluate whether a defendant was "in custody." Those factors are: whether probable cause to arrest existed; whether the defendant was the focus of the investigation; the subjective intent of the police; and the subjective belief of the defendant. *Ruth v. State,* 645 S.W.2d 432 (Tex.Cr.App. 1979); *Newberry v. State,* 552 S.W.2d 457 (Tex.Cr.App.1977); *Ancira v. State,* 516 S.W.2d 924 (Tex.Cr.App.1974).

*Id.* at 41–42. The court additionally stated that:

"The ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with the formal arrest. *Mathiason,* infra, 429 U.S., at 495, 97 S.Ct. at 714." [Citing *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983).]

*Id.* at 42.

The *Turner* court mentioned the United States Supreme Court's landmark decision regarding this subject, *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), wherein the defendant was contacted by the Oregon State Police who indicated that they would like to discuss some-

thing with him. A meeting was set up at the State Patrol Office, and at the meeting the defendant was told he was not under arrest. The officer told the defendant that he wanted to talk with him about a burglary, and further stated that the police believed that he was involved, whereupon the defendant then gave an oral confession. In determining whether it was necessary for the police to give *Miranda* warnings prior to appellant orally confessing, the Supreme Court found that the defendant was not in custody at the time that he gave this statement, and the Court opined:

> Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment". Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.

*Oregon v. Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714.

The Texas Court of Criminal Appeals has stated that it finds it difficult to formulate a general rule to distinguish custodial interrogation from non-custodial interrogation, and a case by case approach in which the evidence is reviewed is deemed necessary. *See McCrory v. State,* 643 S.W.2d 725, 726 (Tex.Crim.App.1982, en banc). Keeping in mind the four factors enumerated in *Turner v. State,* 685 S.W.2d at 41–42, our determination in the instant case must be based upon the totality of the circumstances established. *See McCrory,* 643 S.W.2d at 734.

The evidence adduced at the suppression hearing revealed that Sergeant Glen Smith of the Wichita Falls Police Department interviewed Berghahn on three occasions prior to his arrest. The first interview occurred a week after the deceased's body was found. Sergeant Smith testified that the police had checked on several leads and had obtained some information which had indicated that Berghahn may have been responsible for the child's murder. Sergeant Smith and another officer then went out to Berghahn's residence and talked with him; they informed him at that time that he was considered to be a suspect in the case, and inquired whether he would consent to taking a voluntary polygraph test. Berghahn agreed and the polygraph examination was conducted several days later at the Wichita Falls Police Department.

Prior to Berghahn taking the examination, two police officers advised him that the polygraph had to be taken voluntarily, and a Justice of the Peace read Berghahn his *Miranda* rights. Berghahn was also informed he had a right to discontinue the polygraph examination at any time and could decline to answer any questions. He was further told that he could terminate the interview at any point he so wished, and he was not under arrest and was free to leave. Additionally, Sergeant Smith testified that Berghahn was not advised that if he did not take the polygraph examination, he would be arrested, and there were no physical restraints placed on Berghahn during the administering of the polygraph examination. Sergeant Smith stated that he and another police officer had transported Berghahn from his residence to the police station for the purposes of taking the polygraph examination, and that this was arranged when the officers advised Berghahn that they could proceed in this manner if he wished to leave his car at home where his wife needed it. After the polygraph examination was concluded, the two police officers and Berghahn went to lunch, and returned to the police station where the officers further questioned Berghahn about the murder and later that night "released him", although Sergeant Smith testified Berghahn was never under arrest, and that he was there voluntarily.

The next and most crucial interview was conducted on December 11, 1981, at which time a second polygraph test was administered to Berghahn. This had been ar-

ranged via the telephone when Berghahn indicated to Sergeant Smith that he felt he had not done well on the polygraph test, and Smith informed Berghahn that if he wished to take another test, the police could arrange it. Berghahn chose the December 11th date, and two police officers picked him up at his home, under the same arrangement as discussed previously so that Berghahn could leave a car at home for his wife's use. Berghahn was again read his *Miranda* rights by Sergeant Smith and was told that: the polygraph had to be taken voluntarily; he had the right to have an attorney present; he could terminate the examination at any time; the doors were not locked and he was free to leave; and the police would provide transportation back to his residence, or he could arrange transportation for himself. The polygraph operator read Berghahn his *Miranda* rights. After the polygraph examination was concluded and the operator informed Berghahn that based upon the examination he believed Berghahn had in fact killed the deceased, Sergeant Smith advised the two men that the police department would provide lunch for them. Lunch was brought in and Sergeant Smith testified that Berghahn was not asked to remain at the police station following the conclusion of the polygraph examination, that he did not request to be taken home, that he was not asked to explain why he failed the polygraph, and that Berghahn was advised as to the location of water and restroom facilities. This occurred at approximately 1:30 in the afternoon.

The record is unclear as to exactly what transpired in the subsequent three and one-half hours; however, it appears undisputed that Berghahn remained alone in the polygraph office the entire period of time. At about 5:00 p.m., Sergeant Smith and another police officer entered the room and began further interviewing Berghahn who was first advised that he was not under arrest, he could terminate the interview if he wished, and he was free to leave. Sergeant Smith then informed Berghahn that he felt Berghahn was responsible for his stepson's death, and Berghahn finally broke down and started crying and made the statement that he had killed the boy. No more questions were asked until the Justice of the Peace arrived to once again read Berghahn his *Miranda* rights. With another police officer present, Sergeant Smith asked Berghahn if he would be willing to give the police a voluntary statement concerning Gregory Alan Poore's death, and Berghahn indicated that he would. Sergeant Smith testified that at that point Berghahn was not under formal arrest, that Berghahn did not request to leave the police station, and never requested a ride home. The resulting interview was tape recorded and lasted approximately an hour and fifteen minutes; it was transcribed soon thereafter.

After the interview ceased, Berghahn requested to be allowed to talk with his wife at the police station, and this visit lasted approximately one hour, in private, following which Berghahn was given a hamburger. Berghahn, his wife, and two police officers then drove to the field where the deceased's body had been found, in order to look for the weapon mentioned by Berghahn in his statement. After they were unable to locate the weapon, Berghahn's wife was dropped off at her residence and the remaining persons returned to the police station. Berghahn and the two police officers then proceeded to read and sign the nineteen-page "Voluntary Statement" at issue. After Berghahn signed this statement, he was formally arrested.

Berghahn did not testify either at the pre-trial hearing on the motion to suppress his written statement, or at the trial on the merits. There is absolutely no testimony which even remotely tends to indicate that any of the parties involved evaluated the situation as one where Berghahn was deprived of his freedom of movement and could not leave voluntarily. Had there been such testimony, this evidence if combined with the fact that he remained alone for three and one-half hours in a back room of the police station, after Berghahn was informed that he had failed the polygraph examination, could present a much more

involved factual dilemma. However, this is not the situation with which we are confronted.

■ Applying the factors enumerated previously and stated in *Turner v. State*, 685 S.W.2d at 41–42, we find that Berghahn's nineteen-page "Voluntary Statement" was a voluntary non-custodial statement and was therefore admissible under TEX.CODE CRIM.PROC.ANN. art. 38.22, sec. 5 (Vernon 1979). Accordingly, we hold that the trial court did not abuse its discretion in allowing the statement into evidence. Berghahn's fourth ground of error is overruled.

Berghahn's sixth and seventh grounds of error pertain to language in the indictment which alleged that Berghahn did "intentionally and knowingly cause the death of an individual Gregory Alan Poore by cutting him with an instrument to the Grand Jury unknown." Berghahn first asserts, in ground of error number six, that the trial court erred in overruling his motion for instructed verdict of acquittal made after the State rested. In this motion, Berghahn contended there was a fatal variance between the indictment and the proof adduced at trial. Specifically, the indictment alleged that the instrumentality which caused the death was unknown, whereas the State had introduced direct evidence by way of Berghahn's written "Voluntary Statement", that the "unknown" instrument was actually a piece of sheet metal approximately 2 to 2½ feet long and 3 inches wide.

In ground of error number seven, Berghahn asserts the trial court erred in overruling his motion for instructed verdict of acquittal, made at the close of all the testimony, because the State failed to prove that the Grand Jury used "due diligence" in attempting to ascertain the cause of the victim's death.

We will discuss these grounds of error together. The applicable rule of law regarding this issue was enunciated by the Texas Court of Criminal Appeals in *Corbett v. State*, 493 S.W.2d 940 (Tex.Crim.App.

1973), *cert. denied*, 414 U.S. 1131, 94 S.Ct. 871, 38 L.Ed.2d 756 (1974), as follows:

"The averment of an indictment that the means causing death was unknown to the grand jury is a material allegation, the substance of which must be proven as pleaded. This requirement, however, is deemed sufficiently met, *if the development of the facts on the trial shows the means of death to be uncertain.* It is otherwise, however, if such facts raise an issue as to whether the means of death were known, or could have been known, to the grand jurors by the exercise of reasonable diligence. In such case proof must be made of the lack of knowledge of such fact by the grand jurors, and that reasonable diligence was used to ascertain same." [Quoting from *Mitchell v. State*, 111 Tex.Crim. 101, 10 S.W.2d 87, 89 (1928) (opinion on reh'g.)] [Emphasis supplied.]

*Corbett*, 493 S.W.2d at 952.

Therefore, the threshold question for our determination is whether the evidence adduced at trial showed what object was used to inflict the injury and if so, an issue is then raised with respect to whether the grand jury at the time it handed down the indictment, had sufficient information available to it so as to have been able to ascertain the type of object used to cause the deceased's death. It is undisputed that the Grand Jury had in its possession the autopsy report, the police report, and Berghahn's confession. In the instant case there were no eye witnesses to the offense and no instrumentality or weapon was found or introduced into evidence by the State.

Dr. Charles S. Petty, the Chief Medical Examiner and Director of the Criminal Investigation Lab of Dallas County, testified at trial that in his opinion the deceased "died as a result of an incised or sharp instrument wound of the neck which severed one of the carotid arteries and caused massive hemorrhage and death." The witness was unable to elaborate further as to what type of sharp instrument was used to inflict the fatal wound. There was also a

second wound on the neck, just below the above-mentioned cut. This second wound was a very superficial incised wound, 1½ inches in length, and was separated from the first wound by a gap of ⅛"–¼". Additionally, there were abrasions on the deceased's face, which the witness testified are the types of injuries that might result if an individual had been dragged.

Lastly, as discussed previously, although Berghahn did not testify, the State introduced his written statement in which Berghahn admitted having hit the deceased with a piece of sheet metal 2 to 2½ feet long by 3 inches wide, which injury resulted in the victim's death.

In making our determination as to whether the evidence at trial showed what instrument was used to cut the victim and whether the Grand Jury wrongfully failed to so specify, we must examine the cases relied upon by the parties. In Corbett, 493 S.W.2d at 940, which was a murder case, the indictment alleged that the deceased was killed by a beating in a manner and means unknown to the Grand Jury. A State's witness testified [2] that the defendant had admitted to him that he had beaten the deceased with a piece of pipe. In its opinion, the court stated that there were no eye witnesses to the killing and no pipe, weapon, or other instrument purporting to be the murder weapon was introduced into evidence, nor was there anything in the record to reflect that the police ever found the murder weapon. Id. at 953. The medical examiner testified that the blow on the head of the deceased could have come from "something striking the head, or conversely the head striking something else", and "the cut itself could have occurred from the head striking some edge of the table." The foreman of the Grand Jury testified that the Grand Jury had been unable to determine the weapon used in the killing. The court held the evidence did not reflect that the grand jurors were wanting in dil-

igence in failing to find the murder weapon. Id.

The State relies upon the holding in Corbett as being controlling in the instant case, and mandating affirmance. However, neither the State nor the Court of Criminal Appeals in Corbett mention Jones v. State, 132 Tex.Crim. 216, 104 S.W.2d 42 (1937) (per curiam), the case relied upon by appellant. This case involved a murder prosecution wherein the indictment alleged that the defendant killed her baby son "by then and there crushing the skull of the said infant child by some means to the grand jurors unknown." Id., 104 S.W.2d at 43. The defendant had signed a written statement in which she admitted that "I carried it [the deceased's body] out by holding it by the neck and when I got out there I strangled it and took my hands and mashed the back of its head in;", whereupon it died immediately. Although the District Attorney was not positive that the members of the Grand Jury had the defendant's confession in their possession when they were investigating the case, he was "morally certain" that he had produced it. One of the grand jurors testified that they had attempted to ascertain as best they could the means used to kill the child, but had not been able to do so. This grand juror did not testify as to whether the Grand Jury was actually in possession of the defendant's confession.

The physician in Jones who examined the body of the decedent testified at trial that he found a fracture or crushing over the left ear and left temple of considerable length and breadth, and that it was his opinion that the wound or fracture of the skull was sufficient to have caused the infant's death. Id. The court held that:

> In view of the fact that the district attorney had in his possession the confession of appellant, which the State was largely relying upon for conviction, and that in the said confession appellant specifically stated the means used in committing the

---

**2.** There is no indication in Corbett as to whether the witness had also testified before the Grand Jury, or whether any written statements by the

witness were presented to or considered by the Grand Jury.

homicide, we are of the opinion that the proof fails to support the averment in the indictment that the means used was to the grand jurors unknown.

*Id.* The case was reversed and the cause remanded.[3]

We find *Jones* to be distinguishable from the case at bar. In *Jones,* it was evident that there was no instrumentality or weapon to be found inasmuch as in her statement the defendant stated she had used her *hands* to inflict the fatal injuries. In the instant case, Berghahn stated he used a piece of sheet metal to inflict the injuries, but no such instrumentality was ever located. An analogous situation occurred in *Anderson v. State,* 479 S.W.2d 57 (Tex. Crim.App.1972), wherein the indictment alleged the defendant stabbed the deceased "with an instrument to the grand jurors unknown". The court recited the pertinent facts of the murder case as follows:

At the trial, Emilio Posada and Lee Van testified that they saw physical contact between the appellant and the deceased but neither saw a weapon. Three witnesses testified that appellant either told them or they overhead him say he had used a spoon to kill the deceased. *The appellant gave a statement that he had a sharpened spoon* in his left hand and swung at the deceased with his right arm and that the deceased grabbed appellant's left arm and he pulled it back. The statement also recited that appellant saw blood, thought the deceased was cut in the stomach, became frightened and flushed the spoon down the toilet. The commode in the jail tank was removed and *no spoon was found.* There was testimony that one of the prisoners had a pair of scissors in the cell but none was found in a subsequent search. Many prisoners possessed sharpened spoons

and five such spoons were found in a subsequent search of the cell. These sharpened spoons' as well as five dull ones also found in the search were processed for fingerprints. Appellant's fingerprints were found on none. Blood was not found on any of the spoons. There was testimony that the property of each prisoner was accessible to everyone else. *The doctor who performed the autopsy testified that the wound on the deceased was caused by something that had a sharp edge.*

*No one saw the instrument used to kill the deceased. No instrument was found which could be connected positively to the killing, and the doctor could not be definite about the kind of instrument used.* [Emphasis supplied.] *Id.* at 59.

The court in *Anderson* did not discuss the two-step process subsequently mentioned in *Corbett,* whereby we must initially determine "if the development of the facts on the trial shows the means of death to be uncertain." *Corbett,* 493 S.W.2d at 952. *See also Washington v. State,* 677 S.W.2d 142, 145 (Tex.App.—Dallas 1984, no pet.). However, the court held, without mentioning *Jones v. State,* that the evidence in the case was sufficient to show that the Grand Jury used reasonable diligence in attempting to discover the exact instrument used in the offense. *Anderson,* 479 S.W.2d at 59–60.[4]

█ In the instant case, notwithstanding the fact that in his written statement Berghahn indicated he had used a piece of sheet metal to cut the victim, there were no eye witnesses to the crime, no piece of sheet metal was ever recovered, and the medical examiner could only give his opinion that the carotid artery was cut with a

---

3. This case was more recently used as the basis of reversal in *McIver v. State,* 555 S.W.2d 755, 756 (Tex.Crim.App.1977).

4. We feel it appropriate at this juncture to note a specific recommendation made in *Anderson* by the Court of Criminal Appeals:

1. In situations such as this, to avoid possible variance, an indictment could be present-

ed alleging in the conjunctive "all possible means of doing the killing, including with an instrument to the Grand Jury unknown." Proof of one of the means would suffice. *See Helmus v. State,* Tex.Cr.App., 397 S.W.2d 437 (1965), and *Burt v. State,* 38 Tex.Cr.R. 397, 40 S.W. 1000.

*Anderson,* 479 S.W.2d at 60, fn. 1.

sharp instrument. We hold that the development of the facts on the trial showed the means of death to be uncertain. Therefore, there was no fatal variance between the indictment and the proof adduced at trial. Berghahn's sixth ground of error is overruled.

In view of our disposition of ground of error number six, it would ordinarily be unnecessary for us to address the issue of whether the Grand Jury used due diligence in attempting to ascertain the cause of the victim's death. However, we have thoroughly reviewed the evidence and we hold that the Grand Jury did make diligent efforts, prior to returning the indictment against Berghahn, to determine the precise means used to cause death. Berghahn's seventh ground of error is overruled.

The judgment of the trial court is affirmed.