Joseph Paul TURNER, Appellant,

v.

The STATE of Texas, Appellee.

No. 69221.

Court of Criminal Appeals of Texas, En Banc.

Jan. 16, 1985.

Dave P. Dolezal, El Paso, for appellant.

Steve W. Simmons, Dist. Atty. and Matthew Dekoatz, Asst. Dist. Atty., El Paso, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

Appellant was convicted of capital murder. The jury answered the punishment issues affirmatively, and punishment was assessed at death.

Appellant raises four grounds of error, including a contention that the trial court erred in overruling his motion to suppress his confession. Appellant contends that prior to the time he was informed of his *Miranda*[1] rights and his rights under Art.

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

38.22, V.A.C.C.P., he was interrogated while in custody. He argues that information elicited at that time and after the warnings were given should have been suppressed. We will address this contention first.

During the early morning hours of October 7, 1980, Kathleen Wilson was strangled at the Winchell's Donut Shop where she worked as a baker. United States currency, which had been placed in the shop's cash drawers at closing time on October 6, 1980, was missing when the offense was discovered.

John Stevens Sr. testified that at about 5:30 or 6:00 o'clock on the morning of October 7, 1980, he and his wife had been awakened by their dogs barking at something outside the fence of their front yard. They looked out the window but saw nothing strange. Later that morning Stevens went out to get the newspaper and noticed "a whole mess of clothes" in his garbage can, which was located near the front-yard fence, including: a shirt which looked only slightly worn, a pair of black pants, a multi-colored sweater-jacket, a pair of short boots which zipped up the side, a pair of brown leather work gloves, and one dark sock. Stevens and his wife knew the clothes were not theirs and, recollecting having heard on the radio about the police looking for something, Stevens called the police and gave them the clothes.

Detective Alfredo Bonilla testified that he investigated Kathleen Wilson's murder. He said that the morning of the murder he spoke with Laura Iaeger, the manager of the donut shop, and asked her to come to the police station and discuss the case. She gave him the job applications of past and present employees. During the day, several employees who had been brought to the station gave statements. After talking to those people and Iaeger, Bonilla compiled a list of all the people who had worked at the Winchell's Donut Shop within the past few months. By that night Bonilla had contacted all but two or three of the people on the list. He and another detective went to talk to appellant, who, as a former employee, was on the list, while two other detectives went to talk to other people.

Bonilla stated that, late in the afternoon of October 7, he had learned that a patrol car had turned in some clothing found in a garbage can located at a residence fairly close to the shop. Before he left the police station to try to contact people on the list, he looked at the clothing and the black military-style boots and noticed that the boots had the brand name "Tong Young" marked on them. At that time there was nothing to connect the clothes to the offense.

Appellant lived nearby, apparently on the same block in which the clothes were found. He answered the door when the detectives knocked. Bonilla identified himself and his partner and told appellant they were investigating the murder of a baker at Winchell's Donut Shop. Bonilla told appellant that they knew he was a former employee and wanted to talk to him to see if he had any information that would be helpful. Appellant asked the detectives to come into the house and told them that he had worked there but had quit. Bonilla said that all the photographs and material were at the police station and he asked appellant if he would go with them to the police station to look at some photographs and talk with them about some people. Appellant agreed, saying that he would do anything he could to help. He told Bonilla he had no money or gasoline and asked if it was all right if he rode with them and if they could bring him back later. Bonilla agreed, and they drove to the station.

Bonilla and appellant went to Bonilla's office to talk. Two other officers were in and out of the office during the conversation. Bonilla testified that at that time appellant had not become a suspect, that it had been a normal interview to obtain information about the case—just like the ones he had conducted with everybody else who had been employed there at one time or another.

Bonilla began by asking him when he had been employed and why he had quit.

Bonilla said that appellant liked to brag and that during the course of the conversation appellant told him that he had gone into the service after he had been working and that he had been stationed in Korea. He also said that he had bought some real nice suits over there for $25, and that he had also bought a pair of nice boots in Korea which had a brand name Tong, but that he could not remember the second part of the name. As soon as he said this Bonilla became suspicious of appellant because he remembered that the boots found in the garbage can carried the name "Tong Young." At that point Bonilla left the office, spoke to his partner, and told him that he thought appellant might have some involvement in the case and that they had better advise him of his rights to silence and to representation by an attorney.

Bonilla advised appellant of his rights, gave him the *Miranda* card to read, had him initial the card after he had read it, and then read him the warning imprinted at the top of their confession form. Appellant stated that he understood his rights and that he chose to waive them, and initialed the written waiver.

Appellant then made a three-page confession in which he stated that he had called the donut shop about 3:15 a.m., pretending to be an employee from another Winchell's and asking to borrow some supplies. He then went to the donut shop, knocked, and Kathleen Wilson—whom he did not know—let him in. He told her he was a former baker there and that he had called and made the supply request as a joke, expecting to see the manager, whom he did know. Wilson told appellant that, although she had told him on the phone that the manager would be in soon, she had said that so that nobody would know she was alone. Appellant drank a cup of coffee and talked while Wilson worked. He said Wilson told him about her divorce and that they hugged and kissed. He said that he then went home and went to sleep until about 7:30 a.m. when he saw on television that a baker had been killed in the area where the donut shop was located. He knew he would be the main suspect so he shaved off his mustache and dumped the clothes he had been wearing in the garbage can. Then appellant stated that he had had intercourse with the victim and that he had gone to the donut shop with the intention of robbing and killing her, had tied her hands behind her back, strangled her, and had taken money from the cash drawers.

Appellant initialed each page of the confession. Included on the third page was a paragraph stating that appellant's rights had been read to him, and that he had read them, understood them, and chosen to waive those rights and voluntarily make the three-page confession that he had made. The paragraph also stated that appellant was fully aware that the offense he had committed was capital murder, punishable by life imprisonment or death. Appellant read the confession and signed it.

Appellant testified at trial that he had understood his rights and waived those rights when he gave the statement. He said that three-fifths of the statement was true and was what he had told Bonilla, but that the last part about killing and robbing Kathleen Wilson was not true and that he did not say that.

Appellant contends that his statements made to Bonilla from the time he began talking to him at the police station up to the time the warnings were given are inadmissible because the entire interrogation was a custodial interrogation and such statements are inadmissible under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He also contends that the confession should have been suppressed because the pre-warning information led to it.

 Custodial interrogation means "... questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612. A person need not be under "formal" arrest in order to be in custody. The facts of each case must be examined in light of the four factors delineated as the

guides within which to evaluate whether a defendant was "in custody." Those factors are: whether probable cause to arrest existed; whether the defendant was the focus of the investigation; the subjective intent of the police; and the subjective belief of the defendant. *Ruth v. State*, 645 S.W.2d 432 (Tex.Cr.App.1979); *Newberry v. State*, 552 S.W.2d 457 (Tex.Cr.App.1977); *Ancira v. State*, 516 S.W.2d 924 (Tex.Cr.App.1974).

■ An examination of these factors demonstrates that appellant was not in custody at the time the pre-warning statements were made. At the time appellant began talking with Bonilla he was simply one of many former employees questioned as part of the investigation. Appellant was one of the last people contacted. Bonilla certainly did not have probable cause to arrest him, indeed, Bonilla did not know that the boots and clothes found in the garbage can had any connection with the murder or with appellant. Thus, the subjective intent of the police, shown by Bonilla's statements and supported by the facts of the investigation, demonstrate that appellant was simply being interviewed just as the other employees had been, as part of the fact-finding process. In that sense appellant may have been *a* focus of the investigation, but he was certainly not *the* focus of the investigation. He was a former employee and had been out on his motorcycle late that night. Beyond that, the police knew little else. Finally, appellant agreed to help police in any way he could, asked them for a ride to the police station, and gave no indication he thought he was not free to go.

"The ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest. *Mathiason*, infra, 429 U.S., at 495, 97 S.Ct., at 714." *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983).

In the instant case there was no such restraint. Appellant agreed to go to the police station and help in any way that he could. He even asked the detectives for a ride to the station and back from there.

The fact that he was then interviewed at the police station does not make the event a custodial interrogation, although it is a circumstance to be considered.

In *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) the defendant voluntarily went to the police station at the police officer's request. He was told he was not under arrest and that the officer wanted to talk to him about a burglary. The officer told him (falsely) that his fingerprints had been found at the scene. The defendant then admitted that he had taken the property. The officer advised the defendant of his rights and taped a confession. The defendant was permitted to go home and the officer told him he was referring the case to the district attorney for him to decide whether criminal charges should be brought. The Supreme Court held that the defendant was not in custody "or otherwise deprived of his freedom of action in any significant way."

The instant case is stronger than *Mathiason* because the defendant in that case was "more of a suspect" than appellant was in the instant case.

Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Mathiason*, 429 U.S., at 495, 97 S.Ct. at 713–14.

The instant case is analogous to *Brown v. State*, 475 S.W.2d 938 (Tex.Cr.App.1971). Police did not initially single out appellant, but simply wished to talk to him as one who might have some helpful information. Only when appellant said that he had a pair of Korean boots did Bonilla become aware of the probability that appellant might be involved, and he immediately undertook to advise appellant of his rights. Although not stated specifically, the indication from the record is that appellant was not restrained and was free to leave until Bonilla realized the likelihood of his involvement with the murder. Appellant was not in custody when he began talking with Bonilla. His statements made prior to the warnings were admissible.

■ Neither *Miranda* nor Art. 38.22, V.A.C.C.P., prohibits the introduction of appellant's confession. His contention at trial was that he had never told Bonilla the part of the confession admitting to killing and robbing the victim. The court found otherwise and Bonilla's testimony supports that finding. The confession was properly admitted. The ground of error is overruled.

■ Appellant argues that the court erred in excluding the testimony of defense witness Thomas Hughes. Hughes was a former assistant district attorney. In the bill of exceptions Hughes testified that he had been an assistant district attorney in El Paso and several other counties for a total of about 2½ to 3 years. He said that in that time he had tried 35 to 40 cases where confessions were admitted into evidence. He looked at appellant's confession and said that the form of the confession was not like those he had seen and that it was unusual because it was exculpatory for a page and three-fourths and then incriminating for one small paragraph. He characterized the confession as "flaky."

In his brief, appellant states that "in an effort to bring to the jury some evidence so as to allow them to better to understand the methods and procedures for taking depositions (sic) and to understand the peculiar format and language of the instant deposition, (sic) [he] attempted to have the testimony of Thomas Hughes." The State replies that Hughes was not qualified as an expert and that his testimony did not relate to a subject on which an expert would be of assistance to the jury.

The court found, as a matter of law, that the confession was voluntary. The jury had to decide if appellant had been advised of his rights; if he had intelligently and voluntarily waived those rights; and if he had made the statement voluntarily. The inference appellant was obviously trying to make was that the police had changed the confession. Appellant, himself, testified that everything about the confession happened the way Bonilla had said it did, that he had understood and waived his rights, and that his statement was voluntary, except that he claimed that he did not say he had killed and robbed the victim.

First, Hughes was not qualified as an expert. *Holloway v. State*, 613 S.W.2d 497 (Tex.Cr.App.1981). Second, Hughes' testimony would not have aided the jury in determining whether to believe Bonilla or appellant as to the "true" contents of the confession. The jury was perfectly capable of determining the credibility of the witnesses on their own. The testimony was properly excluded. The ground of error is overruled.

Next, appellant contends that the court erred at the punishment stage by admitting the testimony of Officer Quiroz. At the punishment stage, the State called Quiroz and Officer Feverson to testify about appellant's attempted escape from jail.

Quiroz was a detention officer working in the El Paso county jail. He testified that on March 22, 1981,[2] at about 9:10 p.m., he was assaulted on the sixth floor of the jail. Four inmates grabbed him and struggled with him. He also saw another inmate, whom he could not identify, trying to

---

**2.** Although there is some reference to March 21 in the record, it is apparent from reading all the testimony that all parties were referring to March 22, 1981.

unlock the door to the sun porch, which led to the roof. One of the four held a shank[3] to his eye, while another held a butter knife against his ribs. Quiroz was stabbed in the leg during the struggle and then fell into the elevator. Quiroz specifically named each of the four inmates with whom he struggled, said that he could not identify the person at the door, stated that he did not see appellant, and that appellant was not involved in the assault. Quiroz also said that the roof looked down on Overland Street.

Officer Feverson, a police officer for the El Paso Police Department, testified that he had worked the 3:00 to 11:00 p.m. shift on March 22, 1981. Just before he got off duty that night, he and his partner drove onto Overland Street and he saw a person coming down the side of the building from the roof, on a rope. He arrested that person, whom he identified as appellant, and found a screwdriver in his back pocket. The other escapees were apprehended on the roof.

In its brief, the State simply says that evidence of an escape is admissible and that Feverson's testimony, admitted without objection, "was in agreement" with Quiroz's testimony. Feverson's testimony shows that appellant was caught escaping from the roof and that others were also caught on the roof at the same time. Feverson's testimony does not show how many other people were caught, or whether the four whom Quiroz identified as his assailants were among those caught. The inference is that appellant was the unidentified fifth inmate trying to unlock the sun-porch doors, and was, therefore, acting in concert with the inmates who assaulted Quiroz, although he was not, according to Quiroz's testimony, among the group that assaulted Quiroz. No testimony was offered to actually link appellant with the named four assailants; there was no showing whether they were the persons apprehended on the roof.

During argument at the penalty stage the State discussed the escape testimony very briefly, noting only that appellant had been caught with a screwdriver that had been modified to resemble an ice pick. The rest of the argument was directed to the murder and robbery, the planning and carrying out of the crime, and the method used to commit the crime.

■ The State is correct in asserting that proof of appellant's escape is admissible at the punishment stage. *Smith v. State*, 683 S.W.2d 393 (1984); *May v. State*, 618 S.W.2d 333, 342 (Tex.Cr.App.1981); *Rumbaugh v. State*, 589 S.W.2d 414, 418 (Tex.Cr.App.1979). However, Quiroz's testimony does not implicate appellant in the assault or as acting in concert with the assailants. In fact, it does not even place appellant at the scene. Feverson's testimony does show that appellant was caught while escaping, but it does not link appellant with the assault on Quiroz. Feverson's testimony was admissible. *Smith*, supra, *May*, supra. The inference the State would like to make to link appellant with the assault is simply not presented by the evidence. Quiroz's testimony should not have been admitted because no link to appellant was shown.

Although we hold that, because no link was shown connecting appellant to the assault, Quiroz's testimony should not have been admitted, we find the admission to be harmless beyond a reasonable doubt, because Quiroz clearly stated and reiterated several times that appellant was not involved in the assault and that he never saw appellant. He even named the four inmates who had assaulted him. It was clear that appellant was not involved in the assault itself. The evidence revealed an extraneous offense committed by others and not involving appellant. Because such testimony was irrelevant it should not have been admitted, but for the same reason it was harmless: appellant was not involved. *Mitchell v. State*, 650 S.W.2d 801, 811 (Tex. Cr.App.1983); see also *Lindley v. State*,

---

**3.** A homemade weapon.

635 S.W.2d 541, 545 (Tex.Cr.App.1982). The ground of error is overruled.

In his last ground of error appellant contends that the trial court erred in overruling his motion to quash the indictment. While appellant filed a motion to quash stating that the indictment failed "to allege the manner of ownership and does not allege which statutory alternative, relating to ownership, upon which the State will rely", it appears from the one sentence "argument" to the trial court and from his brief that appellant's contention is that the motion to quash should have been granted because "it is impossible to rob someone who is not present and as such the indictment was defective."

 First, we note that in the face of a motion to quash based upon a claim of insufficient notice, we examine the indictment *on its face,* and in light of the presumption of innocence. *Jeffers v. State,* 646 S.W.2d 185 (Tex.Cr.App.1981). The fact that the evidence may later show sufficient facts has no bearing on a motion to quash claiming insufficient notice. *Jeffers,* supra. Appellant's claim on appeal is that the owner of the property was not present during the murder and therefore the allegations were not correct. Since we do not consider the evidence presented at trial in evaluating appellant's claim, appellant's argument is without merit.

The indictment alleges, in pertinent part, the following:

[Appellant] did then and there unlawfully intentionally and knowingly cause the death of an individual, KATHLEEN WILSON, by placing a rope around the neck of KATHLEEN WILSON and strangling the said KATHLEEN WILSON and the said JOSEPH PAUL TURNER did then and there intentionally and knowingly cause the death of the said KATHLEEN WILSON in the course of committing the offense of Robbery, to-wit: the said JOSEPH PAUL TURNER on or about the 7th day of October, 1980, in El Paso County, Texas, did then and there unlawfully, intentionally and knowingly while in the course of committing theft, to-wit: the said JOSEPH PAUL TURNER, did then and there intentionally and knowingly appropriate property, to-wit: currency of the United States, from LAURA IAEGER, without the effective consent of the owner, LAURA IAEGER, and with intent to deprive the said owner of said property, did with intent to obtain control of the said property, the said JOSEPH PAUL TURNER, did then and there intentionally and knowingly cause bodily injury to KATHLEEN WILSON by strangling the said KATHLEEN WILSON with a rope,...

From the standpoint of notice requirements the indictment is sufficient to apprise appellant that he was accused of murdering Kathleen Wilson in the course of committing theft of property belonging to Laura Iaeger by robbing Kathleen Wilson. The indictment is sufficient in the face of appellant's motion to quash. The ground of error is overruled and the judgment of the trial court is affirmed.

CLINTON and TEAGUE, JJ., dissent.

TEAGUE, Judge, dissenting.

I respectfully dissent to the majority's holding in this death penalty case that the error of the trial court, in admitting into evidence Quiroz's testimony, was harmless beyond a reasonable doubt. I believe that the error, as to the punishment stage of appellant's trial, was not harmless beyond a reasonable doubt.

Under this Court's past decisions, before error can be deemed harmless, it must be shown that there is not a reasonable possibility that the error contributed to the defendant's conviction or to the punishment that was assessed. The test to determine whether the error is harmless is not whether a conviction could have been had without the erroneously admitted evidence or testimony, or that the punishment that was assessed could not have been assessed without the erroneously admitted evidence or testimony, but, instead, is whether there is a reasonable possibility that the erroneously admitted evidence or testimony might have contributed either to the finding of

guilt or the punishment that was assessed. See, for example, *Garrett v. State*, 632 S.W.2d 350, 354 (Tex.Cr.App.1982).

Art. 37.071, Section (c), V.A.C.C.P., expressly provides that where the jury is called upon to answer special issue number 2, see Art. 37.071, Section (b)(2), supra, in the affirmative, the State must prove such issue beyond a reasonable doubt. Special issue number 2 reads as follows: Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. In this instance, the jury answered the question in the affirmative. Thus, the question that this Court must decide is whether there is a reasonable possibility that the erroneously admitted testimony of Quiroz affected the jury's decision to answer special issue number 2 in the affirmative.

I ask the majority: How can what it has determined to be error be harmless beyond a reasonable doubt as to the punishment stage of this capital murder case? More specifically, how can such error be harmless beyond a reasonable doubt as to the jury's decision to answer in the affirmative the second or the probability special issue, that was required to be answered by the jury beyond a reasonable doubt before the punishment of death could be assessed the appellant?

This Court in *Roney v. State*, 632 S.W.2d 598 (Tex.Cr.App.1982), after finding that the evidence was insufficient to sustain the jury's affirmative answer to the probability question, reformed the defendant's sentence to life imprisonment. In so holding, this Court stated the following: "To hold that the facts of this offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capri-

cious and arbitrary imposition." (Citations Omitted.) (603).

The majority does not refer us in its opinion to any other evidence or testimony that might reflect or be considered relevant to the issue of future violent conduct by appellant, and I am unable to find any such evidence or testimony in the record on appeal.

In *Wallace v. State*, 618 S.W.2d 67 (Tex. Cr.App.1981), this Court also held that the evidence was insufficient to sustain the jury's affirmative answer to special issue number 2. Before reforming the death sentence that was assessed in that cause to life imprisonment, this Court stated the following: "Specifically, there was no evidence of prior convictions, no prior acts of violence, no character evidence, no psychiatric evidence. Although the circumstances of the murder may be sufficient to support a death penalty . . ., this is not such a case . . ." (69). In this instance, there is also no evidence of prior convictions, prior acts of violence, character evidence, or psychiatric evidence that might relate to the appellant.

Without the erroneously admitted testimony of Quiroz, that reflects a violently conducted escape from the El Paso County Jail, I believe that there is either a reasonable doubt that the evidence is insufficient to sustain the jury's affirmative answer to the second special issue, or that there is a reasonable possibility that the erroneously admitted testimony contributed to the decision of the jury to answer special issue number 2 in the affirmative.

Thus, the error was harmful, not harmless. The majority errs in holding that the error was harmless.

I respectfully dissent to its holding.