

# Fourth Court of Appeals

## San Antonio, Texas

## MEMORANDUM OPINION

Nos. 04-11-00636-CR and 04-11-00637-CR

The **STATE** of Texas,
Appellant

v.

Shelby Cole **MOORE**,
Appellee

From the 216th Judicial District Court, Gillespie County, Texas
Trial Court No. 5022
Honorable N. Keith Williams, Judge Presiding

### OPINION ON APPELLEE'S MOTION FOR REHEARING

Opinion by:    Patricia O. Alvarez, Justice

Sitting:    Sandee Bryan Marion, Justice
Marialyn Barnard, Justice
Patricia O. Alvarez, Justice

Delivered and Filed:  February 13, 2013

AFFIRMED

The Appellee's motion for rehearing is granted.  We withdraw our opinion and judgment

of December 12, 2012, and substitute this opinion and judgment.

Appellee Shelby Cole Moore was indicted for the murder of Trey Noah and tampering

with physical evidence.  Moore filed a motion to suppress his statements to the investigating

officers. The trial court granted the motion to suppress in large part, and denied the remainder of the motion.[1] The State appeals. We affirm the trial court's order.

## BACKGROUND

On April 18, 2010, Trey Noah's body was found in a remote location in Gillespie County, Texas. The medical examiner ruled Noah's death a homicide resulting from a single gunshot wound. Kendall County law enforcement officers spoke to several individuals regarding the murder, including Moore, Noah's first cousin. Weeks later, after being contacted by telephone by Gillespie County Sherriff's Deputy Brian Pehl, Moore agreed to be interviewed at the Gillespie County Law Enforcement Center (LEC) in Fredericksburg, Texas.

## A. Initial Questioning

### 1. Voluntary Beginning

On the afternoon of June 10, 2010, Moore drove his vehicle to the LEC where he met with Pehl and Texas Ranger Wayne Matthews in a small interrogation room. Pehl thanked Moore for coming, told him he did not have to talk to the officers, and that he could leave if he wanted to. Moore replied: "Whatever I can do to help. I'm game. Whatever you need."

### 2. Initial Questioning

Pehl began the questioning by asking Moore some general questions about his family, and then asked questions about his relationship with Noah. He asked when Moore last saw Noah, and other questions pertaining to Noah's disappearance. Moore told Pehl he was Noah's first cousin and that they knew each other well, but he repeatedly asserted that Noah did not show up at his house on November 30, 2009 (the day Noah was killed). Moore said he never

---

[1] The trial court suppressed almost all statements and video recordings after Moore "talks about the involvement of 'Marco from Hondo—of the Mexican Mafia' and his (Defendant's) presence at the scene of the murder and his involvement in moving and discarding of the body of Trey Noah in Gillespie County."

saw Noah that day, and he did not know what happened to him. Moore also insisted that, for weeks after Noah's disappearance, he tried to reach Noah by calling and texting him.

### 3. Rebutting Moore's Initial Answers

After listening to Moore's answers to Pehl's questions, Matthews challenged Moore's responses. Matthews told Moore to stop lying: he had phone records that proved Moore was the only one who stopped calling Noah on the day Noah was killed. Matthews said that GPS technology showed Moore's and Noah's cell phones were in the same place at the same time on the day Noah was killed. Matthews told Moore that he believed Moore was a good person, and that Moore could not live his whole life hiding a lie about Noah's death.

## B. Marco Confession

Approximately one hour and thirty minutes into the interview, Moore began to cry. When he regained his composure, he changed his story. He admitted "I watched [Noah] die right in front of me." He said Marco shot Noah, and Moore swore he did not shoot Noah. Moore said Marco was in the Mexican Mafia, came to Moore's house, shot Noah, and then forced Moore at gunpoint to move Noah's body. Because the content and timing of Moore's interview are significant, we will refer to this segment of Moore's interview as the Marco confession. Moore also added that Marco threatened him and his family if he did not cooperate. At the conclusion of his Marco confession, Moore asked Matthews to "watch out for my family."

## C. Harber Confession

After the Marco confession, Matthews challenged Moore's account. He told Moore he knows who Marco is, he investigated Marco, and Marco was not involved. At approximately one hour and forty-five minutes into the interview, Moore again started to cry and then said that the shooter was actually Brandon Harber. Moore said that on November 30th, Harber and Noah argued, Harber shot Noah, and made Moore help him dispose of Noah's body. Moore described

the exact location where they deposited Noah's body. Moore insisted he did not call the police because he was afraid that Noah's blood in his truck would make police believe he killed Noah. Moore asked if he could text Harber. Matthews said no and took Moore's cell phone.

### D. Continued Questioning

Over the next two hours, Matthews again thanked Moore for disclosing what he had revealed so far, but also repeatedly accused Moore of being the shooter. Moore continued to deny that he killed Noah. At about three hours and thirty-two minutes after the interview began, the officers left the room, and Moore laid down on the floor and slept for about thirty minutes.

#### 1. Warned Statement

After he awoke, Moore knocked on the interrogation room door, asked to use the restroom, and was escorted to and from the restroom by an officer. Matthews ordered some food for Moore and then asked Moore to read aloud the *Miranda* warnings from a printed page and then write down everything Moore had just told him. Matthews said "Fill this part out, and then start on November 30th, 2009, at this time, my friend [Harber] whatever, and you run through the whole story . . . . [I]nclude all of that, going to Marble Falls, seeing the movie, dumping the phone, burning the clothes, trading the gun, washing the truck, all of that." Moore read the warnings aloud, initialed each one, and Moore and Matthews each signed the first page of the form. Immediately thereafter, Moore hand wrote a statement on the succeeding pages of the form. When Moore completed writing his statement, Moore and Matthews signed the final page of the form. The State offered Moore's written statement as State's Exhibit 7.

#### 2. Additional Disclosure

Moore continued to assist the officers including riding with them to the site where he helped dispose of Noah's body, and accompanying them to Moore's residence where he gave them permission to search his home. Moore was arrested and spent the night in the county jail.

The next day when Pehl again interviewed Moore and told him that Harber identified Moore as the shooter, Moore terminated the interview and asked for legal counsel.

### 3. *Motion to Suppress*

At the hearing on Moore's motion to suppress his statements, Moore argued that his statements prior to the *Miranda* warnings (unwarned statements) were inadmissible because they were the products of custodial interrogation, and his post-*Miranda* warnings written statement (warned statement) and additional disclosure were likewise inadmissible because the State failed to conduct any curative measures to purge the taint of the unwarned statements. The trial court excluded Moore's statements after the Marco confession, and the State appeals the trial court's order.

### STANDARD OF REVIEW

When we review a trial court's ruling on a motion to suppress, we apply a bifurcated standard. *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). When a question turns on credibility and demeanor, we view the evidence in the light most favorable to the trial court's ruling and give "almost total deference to a trial court's determination of the historical facts that the record supports." *Guzman*, 955 S.W.2d at 89; *Montanez v. State*, 195 S.W.3d 101, 106 (Tex. Crim. App. 2006). We give the same deference to the trial court's rulings on mixed questions of law and fact "if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *Guzman*, 955 S.W.2d at 89; *Montanez*, 195 S.W.3d at 106. We review other mixed questions of law and fact and questions of law de novo. *Guzman*, 955 S.W.2d at 89; *Montanez*, 195 S.W.3d at 106. When custody attaches is a mixed question of law and fact. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007); *Garza v. State*, 34 S.W.3d 591, 593 (Tex. App.—San Antonio 2000, pet. ref'd).

**PROBABLE CAUSE, CUSTODY**

In its first and second issues, the State asserts that the trial court erred when it decided that at the time Moore made his pivotal admissions in his Marco confession—that he was present when Noah was shot and he helped dispose of Noah's body—custody attached to Moore and the officers had probable cause to arrest him.

## A. Applicable Law

A voluntary, non-custodial, oral statement is admissible against an accused without the warnings otherwise required by Article 38.22 and *Miranda*. *See Espinoza v. State*, 185 S.W.3d 1, 3 (Tex. App.—San Antonio 2005, no pet.); *State v. Waldrop*, 7 S.W.3d 836, 839 (Tex. App.—Austin 1999, no pet.). However, an unwarned statement obtained from a custodial interrogation is inadmissible. TEX. CRIM. PROC. ANN. art. 38.22 (West 2005); *see Jones v. State*, 119 S.W.3d 766, 772 (Tex. Crim. App. 2003). What begins as a voluntary, noncustodial interview may escalate into custodial interrogation, and thus invoke article 38.22 and *Miranda* requirements. *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996); *Ussery v. State*, 651 S.W.2d 767, 770 (Tex. Crim. App. 1983); *Xu v. State*, 100 S.W.3d 408, 413 (Tex. App.—San Antonio 2002, pet. ref'd); *see also Turner v. State*, 685 S.W.2d 38, 43 (Tex. Crim. App. 1985).

Custody attaches to an interviewee when "there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave." *Dowthitt*, 931 S.W.2d at 255; *Xu*, 100 S.W.3d at 413. If an interviewee voluntarily discusses the circumstances surrounding a crime being investigated and makes a "pivotal admission" that would lead a reasonable person to believe that the interviewee had committed a crime, the admission supports probable cause. *See Dowthitt*, 931 S.W.2d at 255; *Turner*, 685 S.W.2d at 43; *Xu*, 100 S.W.3d at 413. Custody attaches "if the manifestation of probable cause [such as an inculpating admission by the interviewee], combined with other circumstances, would lead a reasonable person to

believe that he is under restraint to the degree associated with an arrest." *Dowthitt*, 931 S.W.2d at 255; *see Turner*, 685 S.W.2d at 41–42; *Xu*, 100 S.W.3d at 413.

## B. Probable Cause to Arrest Moore

In reviewing when the officers had probable cause to arrest Moore, we objectively consider the reasonably trustworthy information known to Pehl and Matthews, and the totality of the circumstances surrounding their investigation and Moore's interview. *See Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009); *Hughes v. State*, 24 S.W.3d 833, 838 (Tex. Crim. App. 2000). In their investigation of Trey Noah's homicide, Pehl and Matthews knew several key facts pertaining to Moore before Moore offered the Marco confession: (1) cell phone records showed that Moore was the only one of Noah's family and friends that abruptly stopped calling and texting Noah immediately after Noah's death; (2) "GPS" data showed Moore and Noah were in the same place on the day of Noah's death; and (3) numerous elements in the story Moore was telling them about his actions on the day of Noah's death were inconsistent with his previous accounts to Noah's parents and Kendall County authorities.

Reviewing the facts and circumstances, we conclude that the evidence supports the trial court's conclusion that when Moore gave the Marco confession—when he admitted he watched Noah die and helped dispose of his body—even though he insisted he acted under duress, the officers had probable cause to arrest Moore. *See Dowthitt*, 931 S.W.2d at 255 ("After [the interviewee's] admission, especially in light of appellant's earlier evasions and inconsistencies, the police had probable cause to arrest."); *Turner*, 685 S.W.2d at 43 (indicating that when the appellant made a statement in which he did not admit culpability for the murder but in which he provided information that tied him to evidence at the murder scene, officers had probable cause to arrest him).

### C. Custody Attached After Marco Confession

In reviewing the trial court's conclusion that Moore's interview changed into custodial interrogation when he offered the Marco confession, we consider the circumstances surrounding Moore's questioning and decide when a reasonable person would have believed "he [was] under restraint to the degree associated with an arrest." *See Dowthitt*, 931 S.W.2d at 255; *Turner*, 685 S.W.2d at 42; *Xu*, 100 S.W.3d at 413. Some of the factors we consider are the length of Moore's interrogation, the degree of police control exercised over him, and his inculpating admission. *See Dowthitt*, 931 S.W.2d at 257; *Turner*, 685 S.W.2d at 41–42; *Xu*, 100 S.W.3d at 413.

#### 1. Length of Moore's Interrogation

The two officers questioned Moore for about one hour and thirty minutes before he offered the Marco confession. During that time, Moore was in a small, secure room inside the LEC with the officers, and there were no breaks in the interrogation. Moore's interrogation up to the point of the Marco confession was shorter than the comparable periods in *Dowthitt* or *Xu*— where confessions caused custody to attach—but longer than the periods in *Beheler* or *Mathiason*—where voluntary confessions did not cause custody to attach. *Compare Dowthitt*, 931 S.W.2d at 256 (at least six hours interrogation before confession) *and Xu*, 100 S.W.3d at 413 (approximately six hours interrogation before confession), *with California v. Beheler*, 463 U.S. 1121, 1122 (1983) (less than thirty minutes before confession) *and Oregon v. Mathiason*, 429 U.S. 492, 493 (1977) (about five minutes before confession). The length of Moore's interrogation to the point he gave the Marco confession weighs somewhat in favor of custody attaching at the point that he offered the Marco confession.

#### 2. Degree of Officers' Control Over Moore

In considering whether a reasonable person would have believed he was not free to leave the LEC after the Marco confession, we consider the factors that indicated Moore was free to

leave and those that indicated that he was not. *See Dowthitt*, 931 S.W.2d at 255; *Turner*, 685 S.W.2d at 41–43; *Xu*, 100 S.W.3d at 413.

### a. Free to Leave Factors

It is undisputed that Moore drove to the LEC of his own accord in his own vehicle. At the beginning of the interview, Deputy Pehl told Moore he did not have to talk with the officers, and that Moore was free to leave. Before the Marco confession, Moore had his cell phone in his pocket, he checked it at least once, and he was not handcuffed or placed in a cell.

### b. Restraint Commensurate with Arrest Factors

However, from the time the interview began until he offered the Marco confession, Moore was in a small, secure room inside a police station. The room had no windows and only one door. No other people entered, left, or transited the interview room. No other business or activities were taking place in the room. Both officers were present during the entire time, with both officers facing him, and with both officers positioned between Moore and the door. Both officers wore badges and visible sidearms.

### 3. *Inculpating Admission*

In all of his previous statements to authorities, Moore insisted Noah did not come to his house, he did not see Noah on the day of his death, and he did not know what happened to Noah. When he offered the Marco confession, Moore admitted that Noah came to his house the day he died, he watched Noah die, and he helped dispose of Noah's body. Moore insisted that he did not shoot Noah—that Marco did—and that Marco threatened to kill Moore if he did not help him dispose of Noah's body.

### 4. *Reasonable Person's Belief*

Because custody may attach when a reasonable person would believe that he is not free to leave, we consider what information a reasonable person in Moore's circumstances knew

immediately before the Marco confession. *See Dowthitt*, 931 S.W.2d at 255; *Turner*, 685 S.W.2d at 41–43; *Xu*, 100 S.W.3d at 414–15. During the questioning, but prior to the Marco confession, Matthews told Moore the following: (1) he and Pehl knew Moore was responsible for Noah's death; (2) he knew Moore had told two different stories to Noah's family and to Kendall County officers, and he accused Moore of lying to him; (3) the evidence, including that from his pickup truck, the telephone call logs, and the GPS position of his phone on the day of the murder, all indicated his guilt; (4) Moore could admit a "bad mistake—I panicked" story or "you can be doing a lot more time because" you are unwilling to tell the truth; and (5) referring to himself and Pehl, Matthews told Moore: "[We're] not going to go away. We're here. It's done."

At that point, about one hour and forty-five minutes after the interview started, Moore confessed that he "watched [Noah] die right in front of me." Moore insisted he did not kill Noah, but he admitted that he helped dispose of Noah's body. Even though Moore told the officers he did not shoot Noah, and only helped hide Noah's body because he feared for his life, a reasonable person would also consider that he had just admitted (1) being present at the scene of a murder, (2) helping to dispose of evidence, and (3) lying to investigating officers.

Considering de novo the length of the interrogation, the officers' control over Moore, and Moore's pivotal admissions, we conclude that Moore's confession "would lead a reasonable person to believe that he [was] under restraint to the degree associated with an arrest."[2] *See*

---

[2] In a recent opinion, this court determined that custody did not attach when the appellant admitted to an officer investigating the crime that he was present at the scene of a murder. *Dominguez v. State*, 04-11-00864-CR, 2012 WL 4809956 (Tex. App.—San Antonio Oct. 10, 2012, no pet.) (mem. op., not designated for publication). *Dominguez* is distinguishable. In that case, the entire interview lasted less than an hour. *Id.* at *2. During the interview, the investigating officer told Dominguez that no matter what he said during the interview, at its conclusion he would be free to leave. *Id.* at *3. During the interview, Dominguez left the room and was not accompanied by officers. The investigating officer repeatedly told Dominguez she would drive him to wherever he needed to go after their interview—and she did; Dominguez was not arrested until weeks later. *Id.* at *4. Further,

*Dowthitt*, 931 S.W.2d at 257 ("While appellant did not admit to committing the offenses, his admission that he was present during the murders was incriminating, and a reasonable person would have realized the incriminating nature of the admission."); *Xu*, 100 S.W.3d at 415.

## D. Effect of Custody

Applying the bifurcated standard of review to the trial court's custody determination, we conclude that when Moore offered the Marco confession, the officers had probable cause to arrest Moore and the previously voluntary interview became custodial interrogation. The trial court did not err in these determinations. We overrule the State's first and second issues.

Therefore, we turn to whether Moore's statement was made as a result of a prohibited two-step "question-first, warn-later" interrogation technique.

### ADMISSIBILITY OF STATEMENTS

In its third issue, the State argues that even if Moore was in custody when he made the pivotal admissions, all of his statements are admissible under *Oregon v. Elstad*, 470 U.S. 298 (1985). For purposes of analyzing this issue, we separate Moore's statements into three parts and address them as listed: (1) his voluntary statement—the information he disclosed up through the Marco confession; (2) his unwarned statement—the information he disclosed after his Marco confession but before he was first warned; and (3) his warned statement—the information he disclosed, including his written statement, after he first received *Miranda* and Article 38.22 warnings.[3]

---

the trial court found that Dominguez was not under arrest, he was free to come and go, and his statement was voluntary; it denied his motion to suppress. *Id.* at *2.

[3] State's exhibits 1–6 are recordings of Moore's interrogation; State's exhibit 7 is Moore's written statement. The trial court denied Moore's motion to suppress State's exhibit 1 up through the Marco confession and State's exhibit 5, a recording from June 11th; it suppressed the remainder of State's exhibit 1 and all of exhibits 2, 3, 6, and 7, and most of exhibit 4. Although Moore's statements in State's exhibit 5 were made after he was first warned, for purposes of the analysis in this issue, we do not include State's exhibit 5 as part of the "warned statement."

## A.  Voluntary Statement

The trial court concluded that Moore's interview with the officers was voluntary up until after his Marco confession; it admitted the portion of the video recording up through the pivotal admissions in the Marco confession.[4]

## B.  Unwarned Statement

The trial court excluded Moore's unwarned statement as a product of unwarned custodial interrogation.  It concluded that after Moore offered the Marco confession, custody attached and the officers were required to advise Moore of his *Miranda* and Article 38.22 rights.  *See Jones*, 119 S.W.3d at 772 ("[A]n accused, held in custody, must be given the required warnings 'prior to questioning.'" (quoting *Miranda v. Arizona*, 384 U.S. 436, 445, 457, 465, 467–68, 474, 478 (1966)); *see also Martinez v. State*, 272 S.W.3d 615, 624 (Tex. Crim. App. 2008) ("When a question-first interrogation begins, it cannot be known whether the suspect will incriminate himself, but the suspect's rights as set out in *Miranda* have already been violated.").  Moore was not warned immediately after the Marco confession, and the trial court properly excluded Moore's unwarned statement.  *See Martinez*, 272 S.W.3d at 624; *Jones*, 119 S.W.3d at 772.

## C.  Warned Statement

The State complains the trial court erred when it excluded Moore's warned statement because the officers did not use a deliberate question first, warn later technique and Moore's warned statement was voluntary.

---

[4] Because the question is not properly before us, we do not decide whether the trial court erred in concluding that Moore's statements up through the Marco confession were non-custodial and voluntary.  *See* TEX. CODE CRIM. PROC. ANN. art. 44.01 (West Supp. 2012) (giving the State the right to appeal an order granting a motion to suppress); *State v. Garcia*, 823 S.W.2d 793, 799 (Tex. App.—San Antonio 1992, pet. ref'd) ("In an appeal by the State under article 44.01, the defendant has no right to an interlocutory cross-appeal.").

*1.  Deliberateness of Question First, Warn Later*

In reviewing a trial court's determination of whether a "question first, warn later" technique was deliberate, we give almost total deference to the trial court's ruling if it is supported by the evidence in the record viewed in the light most favorable to that ruling. *See Carter v. State*, 309 S.W.3d 31, 39–40 (Tex. Crim. App. 2010) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).  If the record supports the ruling, we may not reverse the trial court's determination "simply because [we] would have decided the question differently."  *See Carter*, 309 S.W.3d at 41 (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985)).

Here, the trial court found Matthews and Pehl to be credible witnesses.  Matthews testified that he did not believe he had probable cause to arrest Moore until he gave Moore his Miranda warnings.  Matthews also testified that he did not warn Moore before he did—four hours and twenty-five minutes after Moore's questioning began—because he did not believe he had enough corroboration to support probable cause after the Marco confession or the Harber confession.  In its supplemental conclusions of law, the trial court concluded the officers' questioning of Moore was not a deliberate attempt to circumvent his *Miranda* rights.

Applying the appropriately deferential standard of review, we conclude that the record supports the trial court's conclusion.  *See Carter*, 309 S.W.3d at 39–40.

*2.  Voluntariness of Warned Statement*

a.  <u>Standard of Review</u>

When we review a trial court's grant of a motion to suppress based on the voluntariness of the suspect's confession, we give great deference to its decision to exclude the statement. *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007); *see Guzman*, 955 S.W.2d at 89.

- 13 -

We will not overturn the trial court's decision absent a flagrant abuse of discretion. *Carter*, 309 S.W.3d at 42; *Delao*, 235 S.W.3d at 238.

### b. Determining Voluntariness

The trial court concluded, and we affirmed, that the officers' question first strategy was not deliberate; therefore, "[t]he relevant inquiry [becomes] whether the later, properly warned statement was voluntarily made." *Jones v. State*, 119 S.W.3d 766, 773 (Tex. Crim. App. 2003); *see Missouri v. Seibert*, 542 U.S. 600, 611–12 (2004) ("The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires."). To determine the voluntariness of the warned statement, the fact-finder "must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect.'" *Jones*, 119 S.W.3d at 773 (quoting *Elstad*, 470 U.S. at 318); *accord Carter*, 309 S.W.3d at 41. If the trial court does not state whether the warned statement was voluntarily made, we "impl[y] the necessary fact findings that would support the trial court's ruling if the evidence (viewed in the light most favorable to the trial court's ruling) supports these implied fact findings." *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006); *accord Moran v. State*, 213 S.W.3d 917, 922 (Tex. Crim. App. 2007).

### c. Voluntariness of Moore's Warned Statement

The trial court concluded that Moore should have been warned after he made the Marco confession, but it did not expressly find that Moore's warned statement was not voluntarily made. However, it excluded Moore's warned statement. Therefore, we review the record to see if the evidence—viewed in the light most favorable to the trial court's ruling—supports an implied finding that Moore's warned statement was not voluntarily made. *See Kelly*, 204 S.W.3d at 818–19.

The record shows, *inter alia*, the following regarding the surrounding circumstances and the officers' conduct with respect to Moore during his extended questioning. *See Carter*, 309 S.W.3d at 41 (directing a voluntariness review at the surrounding circumstances and police conduct during the questioning); *Jones*, 119 S.W.3d at 773 (same). Moore's questioning, as recorded in State's exhibits 1–4, and 6, and his written statement in State's exhibit 5, were all obtained from an essentially single, continuous event. *See Jones*, 119 S.W.3d at 775. He was questioned in the same room by the same two officers for over four and one-half hours before he was warned. Immediately before he was warned, Matthews recounted to Moore the facts that Moore had disclosed in the questioning; then, Matthews told Moore to write down everything that Moore had already told him. Moore wrote his account and, at Matthews's prompting, corrected one written fact to correspond to his previous oral statement. *Cf. id.* After the officers finished questioning Moore at the LEC, Moore rode with the officers and showed them where Noah's body was dumped, and then continued on to Moore's home where he gave them more information about Noah's death. During the questioning in the LEC, in the vehicle, and at his home, Moore was continuously under officers' control. At the LEC he knocked on the interrogation room door and was escorted to and from the restroom. Even in his own home, Moore asked the officers for permission to move about.

Viewing the evidence in the light most favorable to the trial court's ruling, we conclude that the record and reasonable inferences therefrom support an implied finding that Moore's warned statement was not voluntarily made. *See Carter*, 309 S.W.3d at 41–42 (voluntariness); *see also Kelly*, 204 S.W.3d at 818–19 (implied findings). We further conclude that the trial court acted within its discretion by excluding Moore's warned statement. *See Carter*, 309 S.W.3d at 41–42; *Delao*, 235 S.W.3d at 238. We overrule the State's third issue.

## CONCLUSION

Having reviewed the record under the bifurcated standard of review, we conclude that the trial court did not err when it concluded that the officers had probable cause to arrest Moore and custody attached to Moore when he made his pivotal admissions. Further, we conclude that the trial court did not err when it excluded Moore's warned statement. Therefore, we affirm the trial court's order.

Patricia O. Alvarez, Justice

DO NOT PUBLISH